UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GLENN ORES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 01097 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| VILLAGE OF DOLTON | ) | |
| and BOLDEN JONES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Sergeant Glenn Ores, a police officer in the Village of Dolton, filed this Section 1983 suit to challenge a fifteen-day suspension he received from Dolton Police Chief Bolden Jones.[1] Ores believes the suspension violated his procedural due process rights because he never had an opportunity to challenge it in a hearing. Defendants, on the other hand, contend that there was no constitutional violation because Ores entered into an agreement giving up his right to challenge the suspension. Alternatively, they argue that Ores could have pursued other state law remedies—which satisfied federal due process—to contest his suspension. Both parties also dispute whether qualified immunity applies and whether Jones is the final policymaker for *Monell* liability. The Court grants Defendants' motion for summary judgment and denies Ores's motion: there was no constitutional

---

[1]The Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

deprivation because Ores could have challenged his suspension in state court, and there is no *Monell* liability because Jones was not a final policymaker.

## I. Background

### A. May 6 Incident and Investigation

Both parties have moved for summary judgment, so in evaluating Ores's motion the Court must draw reasonable inferences in Defendants' favor, and vice-versa on Defendants' motion. This case began with an incident on May 6, 2011, when Sergeant Ores was supervising an 11 PM to 7 AM shift at a Dolton nightclub called Mr. Ricky's. DSOF ¶ 6; R. 59-1, Defs.' Exh. 1, Ores Dep. 11:16-12:7.[2] At the end of Ores's shift, a Dolton police officer named Graham told Ores in the locker room that there had been a confrontation in the parking lot of Mr. Ricky's and that Dolton police officers used force against a woman. DSOF ¶ 6; Ores Dep. 12:5-14:23. Ores did not take immediate action because he did not witness the incident, nobody had been arrested that night, and no written complaint had been filed. *Id*. Ores also did not immediately investigate because he believed Graham had a tendency to embellish things. *Id*. Ores told Graham that he was going on vacation the next day and that he would follow up on the issue when he returned. *Id*.

Soon after, Dolton Police Chief Bolden Jones learned about the May 6 incident and either he or another officer, Commander Spigolon, opened an

---

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Defendants' Statement of Facts) [R. 58]; "Pl.'s Resp. DSOF" (for Ores's Response to Defendants' Statement of Facts) [R. 65 at 1-14]; "PSOF" (for Ores's Statement of Additional Facts) [R. 65 at 15-23]; "Defs.' Resp. PSOF" (for Defendants' Response to Ores's Statement of Additional Facts) [R. 77].

investigation of Ores's failure to investigate an officer's use of force. DSOF ¶ 7; R. 59-3, Defs.' Exh. 3, Jones Dep. 25:5-26:24. Spigolon was in charge of the investigation and requested that Ores submit a written memorandum (also called, in Dolton police vernacular, a "to-from") detailing the events on May 6. DSOF ¶ 8; R. 65-8, Exh. 8, Spigolon Dep. 15:12-19:19; Ores Dep. 15:6-20. Ores submitted this memorandum in July 2011, writing that Graham had observed other officers "hitting a female while on the ground" but that "nobody ever came in to lodge a complaint." DSOF ¶ 8; R. 59-9, Pl.'s Exh. 5, 7/18/11 Memo at 2-3. On October 25, 2011, Jones issued Ores a "Notice of Interrogation Pursuant to Formal Investigation" about this incident and held a formal interrogation on October 27, 2011. DSOF ¶ 9; R. 59-4, Defs.' Exh. 4, Notice of Interrogation. An interrogation is different from a hearing before Dolton's Board of Fire and Police Commissioners ("the Board"); the former is used to gather facts, while the latter is held to determine whether a particular punishment is appropriate or whether the accused is guilty of an alleged rule violation. PSOF ¶¶ 16-17; Kuzas Dep. 47:10-48:13; Jones Dep. 36:16-19, 42:20-43:11.

The police union, of which Ores was a member, then got involved. DSOF ¶ 3; Ores Dep. 8:21-9:4. Harry Blaundin, Ores's union representative, told Ores that union attorney Robert Kuzas would represent Ores in the disciplinary investigation and attend the interrogation. DSOF ¶ 3; PSOF ¶ 10-11; Kuzas Dep. 9:18-24. Before the interrogation, Ores did not know Kuzas; the two met for the first time on the day of the interrogation. Ores Dep. 24:10-26:18. During the interrogation,

Commander Spigolon—through Perry Kendall, counsel for the police department—questioned Ores in Kuzas's presence. *See generally* R. 59-5, Defs.' Exh. 5, Interrogation Tr.; Ores Dep. 32:23-33:2. As was typical in these interrogations, Ores was protected by *Garrity* rights[3] that prevented his statements from being used in criminal proceedings, because officers can be forced by their employer to answer questions. Interrogation Tr. 8:13-9:2; Kuzas Dep. 48:14-49:1. Ores could not issue subpoenas or examine any witnesses in the interrogation, but he was able to answer questions and explain the circumstances surrounding the May 6 incident. PSOF ¶ 20; Kuzas Dep. 50:9-15; Ores Dep. 74:10-75:2.

## B. The Negotiation and Agreement

The facts leading up to the interrogation are not in dispute, but the parties have different versions of the aftermath. According to Defendants, on the day of the October 27 interrogation or shortly after it, Kuzas met with Jones several times to negotiate a collective bargaining agreement. Kuzas Dep. 12:22-17:22. Two others were also present: Rich Haran (another union representative), and an attorney doing labor work for Dolton. *Id.* Even though these informal meetings were not about Ores, the topic of his discipline came up and Jones informed Kuzas that he was thinking about terminating Ores. *Id.* Kuzas responded that termination was too severe and akin to "DEFCON 4" for an officer with an exemplary record and decades of service.[4] *Id.* After two or three discussions, the two agreed to a fifteen-

---

[3]Named after *Garrity v. New Jersey*, 385 U.S. 493, 497-98 (1967).
[4]The federal government's defense readiness condition (DEFCON) system actually rates from least to most serious using a scale from 5 (normal peacetime condition) to 1 (the most serious), so perhaps Kuzas meant DEFCON-1.

day suspension and additional training. *Id.* Kuzas believed that this agreement benefited both sides. *Id.* 19:5-21:14. He knew that formal charges filed against a police officer with the Board were usually accompanied by a hearing. *Id.* And Kuzas believed that if Ores had a Board hearing, there was a substantial chance that he would be fired because Jones could pursue termination. *Id.* So Kuzas agreed to a fifteen-day suspension to "avoid going to a full hearing and taking the possibility of there being a termination." *Id.* 22:7-21. In return, Kuzas—supposedly on Ores's behalf—waived a statutory provision that capped the police chief's unilateral authority to suspend an officer at five days. *Id.* Kuzas also waived a Board hearing and Ores's ability to challenge Jones's unilateral suspension. DSOF ¶ 24; Kuzas Dep. 21:1-14. Although Kuzas believes that Ores was never actually in the same room for the negotiations with Jones, Kuzas Dep. 18:14-21, Kuzas nevertheless says that he spoke to Ores several times after the interrogation to tell Ores about the negotiations, Defs.' Resp. PSOF ¶ 22; Kuzas Dep. 25:5-26:3. Jones remembers that Ores was present for one of the negotiation meetings. Jones Dep. 64:18-65:5.

Ores, on the other hand, says that he never communicated with Kuzas about the disciplinary investigation during the time between the interrogation and receiving his suspension on February 21, 2012. PSOF ¶ 22; Ores Dep. 35:16-37:8. He claims that there was "radio silence" during this period and that he was never apprised about any negotiations or potential agreement. *Id.*

It is undisputed, however, that on February 21, 2012, Jones issued Ores the formal disciplinary report, which included a fifteen-day suspension without pay and

forty hours of supervisory training. Defs.' Resp. PSOF ¶ 25; R. 59-6, Defs.' Exh. 6, Formal Disciplinary Report. Although Jones testified in his deposition that he did not remember Ores's response to the suspension, Jones Dep. 63:16-21, Jones previously declared in an affidavit that upon receiving the formal disciplinary report on February 21, 2012, "Ores expressed that he believed my decision to impose a 15-day suspension was too harsh." Defs.' Resp. PSOF ¶ 25 (citing R. 17, Defs.' Mot. to Dismiss, Exh. A, Jones Aff. at 3). Ores also testified that when Jones handed him the formal suspension, he "looked at Jones" and said: "really? A 15-day suspension? … and I said this is – this is severe, I believe was the word I used." Ores Dep. 39:2-22. According to Ores, this was the first time he had heard about the fifteen-day suspension. *Id.*

## C. Union Grievance

On February 29, 2012, eight days after receiving the formal written suspension, Ores filed a union grievance. R. 59-7, Defs.' Exh. 7, Ores's Grievance. The grievance was signed by Blaundin (Ores's union representative) and Captain Dubish, a high-ranking police department official who received the grievance on behalf of management. *Id.*; Ores Dep. 43:21-44:5. The "remedy sought" was "[s]topping Any Further 'Disciplinary Action' on this matter and to be paid for the 'Suspension Days' served by Sergeant Ores #7." Ores's Grievance. When Ores asked about the grievance a few months later, Blaundin said that Ores should be patient. Ores Dep. 44:10-15. Sometime after that conversation, in the summer of 2012, Ores met with Kuzas, Blaundin, and Haran, and asked about the status of his grievance.

*Id.* 46:7-47:21. Kuzas responded that there was nothing he could do. *Id.* It is undisputed that Ores never heard anything about his grievance, and that he never appeared in a grievance hearing. *Id.* Ores completed his suspension and mandated training by the end of March 2012. Ores Dep. 42:12-43:1.

### D. Procedural Posture

On August 25, 2014, the Court denied Defendants' motion to dismiss Ores's complaint. The complaint alleged that Jones deprived him of procedural due process by failing to provide a post-suspension hearing and that Jones acted as a final "policymaker" when he suspended Ores. R. 37, Mot. to Dismiss Opinion. After discovery concluded in May 2015, the parties filed cross motions for summary judgment. R. 56, Defs.' Mot. Summ. J.; R. 66, Pl.'s Mot. Summ. J. Defendants now argue that Ores received adequate pre-suspension process. R. 57, Defs.' Br.[5] And to the extent that any post-suspension process was required, Ores either gave up this right through the agreement between Jones and Kuzas or failed to take advantage of state remedies—which satisfied federal due process—to challenge his suspension. *Id.* Ores, on the other hand, argues that both his pre-suspension interrogation and lack of post-suspension procedures were constitutionally infirm; furthermore, Ores maintains that he did not consent to the negotiated agreement and that no alternative state-law remedies were available. R. 71, Pl.'s Br. and Resp.

---

[5]To avoid overlap, the Court ordered the parties to file four total briefs: "Defs.' Br." (Defendants' opening motion for summary judgment) [R. 57]; "Pl.'s Br. and Resp." (Ores's combined cross motion for summary judgment and response to Defendants' motion) [R. 71]; "Defs.' Reply and Resp." (Defendants' combined reply to its own motion and response to Ores's cross motion) [R. 76]; "Pl.'s Reply" (Ores's reply on its own motion) [R. 78].

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). As noted above, here both parties moved for summary judgment, so in evaluating Ores's motion the Court must draw reasonable inferences in Defendants' favor, and vice-versa on Defendants' motion. The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that she is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Procedural Due Process

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend XIV, § 1. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citations and quotations omitted). Evaluating procedural due process claims entails "a two-step process: [t]he first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." *Sonnleitner v. York*, 304 F.3d 704, 711 (7th Cir. 2002) (citation and quotations omitted). In this case, the parties do not dispute that Ores had a property interest in continued employment (apparently as protected by state and local laws) and that he was deprived of that interest when he was suspended for fifteen days. Defs.' Br. at 5; Pl.'s Br. and Resp. at 9. Thus, the only question is whether Ores was denied due process—that is, what procedures were due to him and at what time. The Court will analyze the scope of the required procedures before and after the suspension.

### 1. Pre-Deprivation Process

Ores first argues that he was denied a pre-suspension hearing. Pl.'s Br. and Resp. at 6-8. Defendants, on the other hand, believe that the October 27 interrogation served the purposes of pre-suspension due process, Defs.' Br. at 6, which Ores responds was insufficient because he was not allowed to subpoena,

confront, or cross-examine witnesses, Pl.'s Br. and Resp. at 8. The Court holds that the written notice of interrogation that Ores received on October 25 and his interrogation on October 27 comprised enough process, at that stage, to respond to the investigation and proposed discipline.

The essential elements of due process include "notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985) (citation omitted). In *Loudermill*, a seminal case in the law governing public sector employment, the Supreme Court held that due process "requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* at 542. But "some kind of a hearing" before the termination does not have to be exhaustive, because "the promise of an eventual full hearing means that the procedural requirements of the first stage may be somewhat relaxed." *D'Acquisto v. Washington*, 640 F. Supp. 594, 616 (N.D. Ill. 1986) (citing *Loudermill*, 470 U.S. at 545). The purpose of pre-deprivation process is to provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545-46 (citation omitted). That means that the pre-deprivation procedures "need not definitively resolve the propriety of the discharge." *Id.* at 545.

In a later case, the Supreme Court clarified that an employee who was temporarily suspended without pay (as opposed to fired) was *not* due a *pre*-suspension hearing as long as the employee received a prompt *post*-suspension hearing. *Gilbert v. Homar*, 520 U.S. 924, 932 (1997). In *Gilbert*, an employer immediately suspended an employee after the state filed felony charges against him. *Id.* at 927-928. In deciding that a pre-suspension hearing was not required, the Court emphasized that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 930 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). To determine the scope of constitutionally required process, the Court applied the familiar *Mathews v. Eldridge* framework and balanced "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Id.* at 931 (quoting *Mathews*, 424 U.S. at 335) (quotations omitted). A pre-suspension hearing was unnecessary in *Gilbert* because there was little risk of erroneous deprivation, the factor most important to the Supreme Court. *Id.* at 933. Because the state had already arrested and charged the employee with a felony—and thus established probable cause that the employee had committed a crime—there was little risk that the employer's suspension decision was arbitrary. *Id.* at 934. Consequently, no additional procedure was required because the arrest and the filing of charges satisfied the purpose of pre-suspension process: "to assure that there are reasonable grounds to

support the suspension without pay." *Id.* at 933-34. Further, although the employee's private interest was low because he faced only a temporary suspension, the state's interest in immediately suspending potential felons was "significant." *Id.* at 932.

In Ores's case, the *Mathews* framework dictates how to evaluate the process due before his suspension. *Gilbert*, 520 U.S. at 931-32. First, as to the private interest—even though Ores had an interest in uninterrupted pay and continued employment, courts must consider the length and finality of the deprivation. *Id.* at 932. When there is only temporary suspension without pay, the "lost income is relatively insubstantial" and the deprivation is much less severe than a firing. *Id.* As for the Village of Dolton, its interest was admittedly less than what was at stake in *Gilbert*, because no felony charges were filed here. But the Village nevertheless had a significant interest in maintaining public trust and ensuring that its high-ranking police officers were not indifferent to allegations of serious police misconduct in their ranks. *See id.* (state had an "interest in maintaining public confidence" in police officers who "occupy positions of great public trust and high public visibility"); *Ibarra v. Martin*, 143 F.3d 286, 289 (7th Cir. 1998) (the state, which temporarily suspended an employee accused of sexual misconduct, "has a significant interest in the integrity of its probation officers"); Kuzas Dep. 12:15-13:3 (calling Ores's matter a "serious" one).

Finally, as to the risk of erroneous deprivation, "there was nothing like a grand jury proceeding to assure that the charges were supported by probable cause"

like there was in *Gilbert*, so the Court must "look more closely at the procedures [Ores] actually received, to see if they adequately protected him against the risk of an erroneous deprivation of his interest in not being suspended from his job." *Ibarra*, 143 F.3d at 290. The only pre-suspension process that Ores received was the October 27, 2011 interrogation. Pl.'s Br. 6-8. A review of this interrogation shows that the risk of erroneous deprivation was low because there were no major factual disputes about the events underlying Ores's suspension, including the incident at Mr. Ricky's and Ores's handling of the report of misconduct. *See generally* Interrogation Tr. During the interrogation, Ores explained Officer Graham's report about an instance of excessive force by other police officers and admitted that he did not follow up. *Id.* 17:12-27:17. Ores explained his version of the events, clarified his reasons for not investigating Officer Graham's report, and had the chance to add anything that would be important to the investigation. *Id.* 36:18-24. The only issue after the interrogation was what (if any) punishment was appropriate in light of Ores's judgment call that he did not need to immediately follow up on Officer Graham's report. Thus, the interrogation sufficiently ensured that a suspension would not be baseless.

Furthermore, Ores received adequate notice of the ongoing investigation and potential charges against him. Two days before the interrogation, he received a written notice advising him of the formal investigation into the May 6 incident, and also informing him of four potential violations of the Dolton Police Department Rules and Regulations. Notice of Interrogation at 1. These were the same four rules

that Ores was ultimately determined to have violated in his formal suspension in February 2012. Formal Disciplinary Report. The pre-interrogation notice also informed Ores of his right to counsel at the interrogation and the possibility of suspension or discharge. Notice of Interrogation at 1-2. The interrogation and notice were thus constitutionally adequate at this stage because they provided an initial check against a mistaken suspension. *Loudermill*, 470 U.S. at 545.

## 2. Post-Deprivation Process

Having determined that the notice and interrogation were adequate at the *pre*-suspension phase, the next question is whether Ores was entitled to some form of *post*-deprivation process. *See Chaney v. Suburban Bus Div. of Reg'l Transp. Auth.*, 52 F.3d 623, 627 (7th Cir. 1995) ("We apply the *Mathews* analysis to both the pre-deprivation and post-deprivation phases of [the plaintiff's] case."). It is undisputed that Ores did not go through any post-suspension process with the police department or Board, whether in the form of a hearing in front of the Board, union meeting, or otherwise. Defs.' Br. at 5-8; Pl.'s Br. and Resp. at 8-9. Ores argues that this violated due process, while Defendants argue that Ores was not due any process in addition to his pre-suspension interrogation. *Id.*

Neither side is completely right: despite Defendants' argument to the contrary, the lack of *any* post-suspension process would violate procedural due process because it would deprive Ores of a full opportunity to respond. "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Loudermill*, 470

U.S. at 546 (citation omitted). Defendants argue that there was little risk of erroneous deprivation at this stage given the availability of the pre-suspension interrogation and the uncontroverted facts about Ores's behavior. Defs.' Br. at 6-7. It might be true that "additional or substitute process was unlikely to shed more light on the matter" when the evidence against Ores—his failure to follow up on a misconduct report—was "indisputable." *Luellen v. City of E. Chicago*, 350 F.3d 604, 616 (7th Cir. 2003). Having said that, "[e]ven where the facts are clear, the appropriateness or necessity of the discharge [or suspension] may not be," so an employee should be given a "meaningful opportunity" to challenge the decisionmaker's discretion. *Loudermill*, 470 U.S. at 543. In *Luellen*, for example, even though the evidence against the employee was indisputable—the employee was caught red-handed transporting absentee ballots in his trunk—he was afforded post-deprivation process in a hearing by Board of Public Safety, which had to confirm the police chief's suspension. *Luellen*, 350 F.3d at 615. The employee also had ten days to request an investigation by the East Chicago Fire Civil Service Commission. *Id.* Similarly, after receiving his suspension, Ores should have had an opportunity to advocate that a shorter punishment—or none at all—was more appropriate. And there should have been some mechanism to challenge the unilateral decision of a single decisionmaker, Chief Jones. *See Cholewin v. City of Evanston*, 899 F.2d 687, 689 (7th Cir. 1990) (plaintiff's case was presented to and decided by an independent committee comprised of workers' compensation experts who were not part of the police department). So even though Ores was able to

provide his version of the events at the interrogation, he did not have an opportunity to challenge the propriety of a fifteen-day suspension. *See generally* Interrogation Tr.

To be sure, Ores's interest was relatively low, given the duration of his temporary suspension. *See supra* Section III(A)(1). But the government's interest in reduced procedures was also relatively low at this point; unlike the pre-suspension period, where some pressing circumstances might allow the state to skimp on the procedures, *see Gilbert*, 520 U.S. at 929, there were no similar circumstances preventing prompt post-suspension procedures here. Furthermore, Defendants have cited no in-Circuit cases supporting their argument that *no* post-deprivation process was due in these circumstances. Defs.' Br. at 6-8. In sum, Ores's pre-suspension interrogation was not a full opportunity to be heard and an insufficient means to review his imposed punishment.

## B. Adequacy of State Post-Suspension Procedures

But the analysis is not over yet. Even though Ores was constitutionally entitled to receive some form of post-deprivation process, the question now is whether any post-deprivation remedies were available, regardless of whether Ores actually took advantage of them. In other words, because "[t]he whole idea of a procedural due process claim is that the plaintiff is suing because the state failed to provide adequate remedies," it follows that "no due process violation has occurred when adequate state remedies exist." *Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003). When a plaintiff argues that state officials acted in a

random and unauthorized manner to deprive her of due process, she must also "avail[] [herself] of state post-deprivation remedies" or explain why those remedies are inadequate. *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943 (7th Cir. 2010). Here, Ores argues that Jones exceeded his statutory authority by imposing a fifteen-day suspension when he was only authorized to impose suspensions of no more than five days, and that Jones deprived Ores of a chance to review this decision. Pl.'s Br. and Resp. at 8-10. As explained earlier, no additional pre-deprivation process was necessary, and because this type of behavior—namely, "misconduct in failing to follow the requirements of existing law"—"is inherently unpredictable, the state's obligation under the Due Process Clause is to provide sufficient remedies after its occurrence … ." *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008). "Accordingly, [the plaintiff's] claim can stand only if Illinois law provides insufficient remedies for the violation he alleges." *Id.*

Defendants argue that Ores could have appealed his suspension to the Board of Fire and Police Commissioners or filed a union grievance. Defs.' Br. at 12-13. The defense also argues that a variety of state-court actions were available, including a common law writ of certiorari, mandamus, injunction, declaratory judgment, and a Wage Payment and Collection Act claim under 820 ILCS 115/1 *et seq. Id.* at 10-12. Ores responds that each of these actions was either unavailable or inadequate. Pl.'s Br. and Resp. at 9-16. Ores is right as to some of the proposed procedures, but ultimately the Court concludes that state-court process—in the form of mandamus, injunctive relief, and declaratory judgment actions—was available to Ores. So there

17

was no procedural due process violation because the state provided adequate remedies to challenge his suspension.

### 1. Appeal to the Board of Fire and Police Commissioners

Defendants previously argued in their motion to dismiss that Ores could have appealed Jones's decision to the Board of Fire and Police Commissioners, and they continue to maintain this position. *See* Mot. to Dismiss Opinion at 5; Defs.' Br. at 12. To determine whether this option was available, it will be helpful to review the relevant statutory framework governing the police department's employment decisions. *Id.* at 5-9. The Village of Dolton was subject to the Illinois Fire and Police Commission Act, 65 ILCS 5/10-2.1-1 *et seq.* DSOF ¶ 4; R. 65-2, Exh. 2, Dolton Fire and Police Rules § 9(a) ("Discharge from office, or suspension from service in the Fire or Police Department shall be in compliance with the Fire and Police Commissioners Act … ."). When adopted by a municipality, the Act protects police officers from removal or discharge except for "cause, upon written charges, and after an opportunity to be heard … ." 65 ILCS 5/10-2.1-17 ¶ 1. The Act, however, does authorize municipal police chiefs to suspend officers without pay for up to five days, and then provides for a hearing afterwards:

> Nothing in this Section shall be construed to prevent … the chief of the police department from suspending without pay a member of his department for a period of not more than 5 calendar days, but he shall notify the board in writing of such suspension. *The hearing shall be as hereinafter provided*, unless the employer and the labor organization representing the person have negotiated an alternative or supplemental form of due process … .

*Id.* ¶ 5 (emphasis added). Thus, under the Act, any suspension of up to five calendar days triggers a hearing in front of the Board, unless the employer and the officer (through the officer's union) agree to some alternative form of due process. *Id.* In explaining the appeals hearing, the Act then states: "Any policeman . . . *so suspended* may appeal to the board of fire and police commissioners for a review of the suspension within 5 calendar days after such suspension … ." *Id.* ¶ 6 (emphasis added). After evaluating an appeal, the Board may: (1) "sustain the action of the chief of the department"; (2) "reverse it with instructions that the man receive his pay for the period involved"; (3) "suspend the officer for an additional period of not more than 30 days"; or (4) "discharge him, depending upon the facts presented." *Id.* The Village of Dolton's rules on officer suspensions track the requirements of the Act: "[t]he board may suspend any member of the Fire or Police Department … not to exceed thirty (30) days," but "[t]he Chiefs of the Fire and Police Department shall have the right to suspend any officer … for a period not to exceed five (5) days … ." Dolton Fire and Police Rules § 8(a)-(b).

The Act and local rules both make clear that Jones exceeded his authority when he issued the fifteen-day suspension because "the Board has the *sole authority* to discharge or to suspend without pay for a period not exceeding 30 days." *Wilson v. Bd. of Fire & Police Comm'rs of City of Markham*, 563 N.E.2d 941, 944 (Ill. App. Ct. 1990) (emphasis added). *See also Nitschneider v. Miller*, 821 F. Supp. 1258, 1261 (N.D. Ill. 1993) ("While the Chief may act on his own to suspend an officer, he is limited to imposing suspensions of five days or less, and an officer may appeal his

suspension to the Board."); *Le Desma v. Vill. of Burr Ridge Fire & Police Comm'n*, 377 N.E.2d 319, 322 (Ill. App. Ct. 1978) ("When a municipality becomes subject to the provisions of the board of fire and police commissioners division of the Illinois Municipal Code … the commissioners … have exclusive jurisdiction to consider charges against a police officer which might subject him to discharge or suspension exceeding five days"). And Jones was aware of this rule. Jones Dep. 38:22-39:2 ("Q. And how long did you have the authority to suspend an officer for as chief? A. Talking about the amount of days? Q. Yes. A. Five days.").

Defendants nevertheless believe that Ores could have appealed this unauthorized suspension to the Board because the Board would have exercised jurisdiction. Defs.' Br. at 10. The Court previously explained that this did not appear possible on the face of the Act. Mot. to Dismiss Opinion at 7. The appeals provision in paragraph six of the Act states that any officer "so suspended" may appeal—referring back to the suspensions of up to five days in the prior paragraph. 65 ILCS 5/10-2.1-17 ¶¶ 5-6. The statutory text provides no review of any other type of suspension because "if the suspension exceeds five days … the appeal provision in the Code is not even triggered." Mot. to Dismiss Opinion at 7. The absence of review is surprising given that "[p]ursuant to the Illinois municipal code, any disciplinary action in excess of a five-day suspension can only be issued by the Board after a hearing." *Bradford v. Vill. of Lombard*, 2012 WL 1655966, at *2 (N.D. Ill. May 10, 2012) (citing 65 ILCS 5/10-2.1-17). The lack of review also "seems odd because one would think that a suspension of unauthorized length ought to be appealable

(without resorting to a federal due-process claim), but that is not how the statute reads." Mot. to Dismiss Opinion at 7.

The Court previously explained, however, that fact discovery might reveal that despite the statutory text, Board actually *does* hear appeals of unauthorized suspensions and that officers are aware of this option. *Id.* That factual scenario would leave open the possibility that the process was indeed available, even if not dictated by the Act. The Court invited Defendants to present evidence that an appeal to the Board is, in fact, an available post-deprivation remedy in these circumstances. *Id.* But after discovery, Defendants again have not pointed to anything from the record suggesting that such an appeal was available despite the contrary statutory text. Their only argument is that Ores should have tried to request a hearing because "[i]t is entirely speculative how the [Board] would have responded to an appeal." Defs.' Br. at 12. But this speculation is not enough. Ores has met his burden on summary judgment when he showed that an appeal was not available based on the clear statutory text, and Defendants have not presented any evidence to the contrary. The Court holds, therefore, that an appeal to the Board was an unavailable route for Ores to challenge his fifteen-day suspension.

## 2. Union Grievance

Similarly, Defendants argue that a union grievance was also available to Ores. Defs.' Br. at 13. (Remember that the Act authorizes police and fire departments to negotiate post-suspension hearing procedures as part of a labor agreement.) But again, Defendants have not pointed to anything in the record

suggesting that this remedy was actually available. In fact, the union's grievance procedures explicitly state that "disciplinary matters resulting from discipline imposed by the Chief of Police *for all matters up to and including suspensions of up to five (5) days* may be grieved pursuant to the provisions of this Article." R. 59-11, Pl.'s Exh. 10, Grievance Procedure § 6.1 (emphasis added). The union grievance form (that Ores submitted on February 29, 2012) also cites and repeats this rule. Ores's Grievance (quoting § 6.1 that "disciplinary matters resulting from discipline imposed by the Chief of Police for all matters up to and including suspensions of up to five (5) days may be grieved pursuant to the provision of this Article."). Again, Ores has demonstrated that a union grievance was not an available route, and Defendants have not pointed to any evidence showing that a grievance would have been considered.

### 3. Writ of Certiorari

Next, Defendants argue that a variety of state court actions were available to Ores. Defs.' Br. at 11-12. The Court will first address the common law writ of certiorari, which it turns out was not an available vehicle to challenge Ores's suspension. Defs.' Br. at 11-12.

"The common law writ of certiorari was developed to provide a means whereby a petitioner who was without avenue of appeal or direct review could obtain limited review over action by *a court or other tribunal* exercising quasi-judicial functions." *Stratton v. Wenona Cmty. Unit Dist. No. 1*, 551 N.E.2d 640, 645 (Ill. 1990) (citations omitted) (emphasis added). When no statute provides for

judicial review, a writ of certiorari is an alternative mechanism to challenge "a decision by an inferior court or tribunal where that body has acted without jurisdiction, exceeded its jurisdiction or where it is shown that the court or tribunal did not follow the essential procedural requirements applicable to the cases before it." *Rochon v. Rodriguez*, 689 N.E.2d 288, 291 (Ill. App. Ct. 1997) (citation omitted). Because the writ's purpose "is to have the entire record of an inferior tribunal brought before a reviewing court to determine, from the record alone, whether that body acted in accordance with applicable law," the writ cannot be used to challenge an action by a single decisionmaker, who does not count as a tribunal with quasi-judicial functions and who does not maintain a decisionmaking record. *Id.* (holding that a police superintendent's decision to discipline officers was not a judicial or quasi-judicial act); *see also Allgood v. City of Chicago*, 2006 WL 2682302, at *4 (N.D. Ill. Sept. 18, 2006) (same). Just so in this case, where Chief Jones was neither a court nor a judicial tribunal whose decision was subject to review through a writ of certiorari.

### 4. Wage Payment and Collection Act

Ores is also right that the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*, would have been an inadequate remedy. Pl.'s Br. and Resp. at 15-16. The IWPCA requires employers to honor the terms of their agreements with employees by paying all earned wages. 820 ILCS 115/3. The employer must provide "any compensation owed an employee … pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time,

task, piece, or any other basis of calculation." 820 ILCS 115/2. Although Ores could have sued under this statute to recover backpay during his suspension, this remedy would have been inadequate because "Ores is not [only] claiming the wrongful withholding of employee benefits, but [also] that the entire suspension was unwarranted, including a disciplinary notice in his employment file." Pl.'s Br. and Resp. at 15-16. It would be the Board that could provide that sort of prospective relief—that is, getting rid of the disciplinary notice—and a state court could not have used relied on the IWPCA to do so.

In response, Defendants cite *Burton v. Sheahan*, 2001 WL 563777 (N.D. Ill. May 22, 2001), where the court held that the plaintiff could have pursued an IWPCA claim. Defs.' Br. at 11. But that case is distinguishable because backpay would have fully remedied that plaintiff's harm. There, a correctional officer was suspended without pay for eighteen months as he waited for a decision by the Merit Board, which finally issued a four-month suspension. *Id.* at *1. Because the officer served fourteen months over and beyond his actual suspension time, he sued under the IWPCA to recover backpay. *Id.* at *2. The officer was not, however, directly challenging the sheriff's original decision to suspend him without pay, the eighteen-month wait, or the Merit Board's final ruling that he should be suspended for four months for violating department rules. *Id.* Although a backpay award would have been adequate to remedy that particular plaintiff's harm—loss of wages during the fourteen month waiting period—here Ores is seeking more than backpay. The

IWPCA, therefore, would have been an improper vehicle for Ores to challenge Chief Jones's suspension authority.

### 5. Mandamus

The Defendants' final three proposals—mandamus, declaratory relief, and injunction—are sound. Defs.' Br. 11-12. First, mandamus "is an extraordinary remedy to enforce, as a matter of right, the performance of official duties by a public officer where no exercise of discretion on his part is involved." *Lewis E. v. Spagnolo*, 710 N.E.2d 798, 813 (Ill. 1999) (citation and quotations omitted). Mandamus can "compel a public official to perform a purely ministerial duty" and "will be awarded only if a plaintiff establishes a clear, affirmative right to relief, a clear duty of the public official to act, and a clear authority in the public official to comply with the writ." *People ex rel. Ryan v. Roe*, 778 N.E.2d 701, 703 (Ill. 2002) (citations omitted). In contrast, mandamus is not available "to direct a public official or body to reach a particular decision or to exercise its discretion in a particular manner, even if the judgment or discretion has been erroneously exercised." *Rochon*, 689 N.E.2d at 291. For example, in *Rochon*, mandamus was not available to probationary police officers who were fired after missing too many basic training classes because the officers could "not establish[] a clear right to be reinstated." *Id.* at 292. But mandamus was available in another case where an officer "ha[d] shown that he was automatically entitled to one of the two promotions that were actually given since only his name and that of [another officer] were properly on the eligibility list." *Hoffman v. Bd. of Fire & Police Comm'rs of City of Naperville*, 529 N.E.2d 790, 796 (Ill. App. Ct. 1988).

Mandamus was proper because "[u]nder the Board Rules, there was no discretion left in the promotion process." *Id.*

In this case, mandamus was available because, as explained earlier, Chief Jones exceeded his statutory authority in suspending Jones for fifteen days. *See supra* Section III(B)(1). "Pursuant to the Illinois municipal code, any disciplinary action in excess of a five-day suspension can only be issued by the Board after a hearing. 65 ILCS 5/10-2.1-17. In other words, [the police chief] could not have terminated [the police officer's] employment" or suspended him for more than five days because "only the Board could take such action." *Bradford v. Vill. of Lombard*, 2012 WL 1655966, at *2 (N.D. Ill. May 10, 2012). Ores had a clear, affirmative right to relief because Chief Jones's unilateral fifteen-day suspension was without legal authority, and Ores could have requested backpay, a hearing, or formal filing of charges with the Board. *See, e.g.*, *Genius v. Cty. of Cook*, 2011 WL 9558925, *17 (Ill. App. Ct. 2011) (plaintiff could have brought mandamus action when the "District was without authority to suspend [plaintiff] for more than 30 days without filing written charges before the Civil Service Commission and providing him with an opportunity to be heard in his own defense."); *Szewczyk v. Bd. of Fire & Police Comm'rs of Vill. of Richmond*, 885 N.E.2d 1106, 1114 (Ill. App. Ct. 2008) ("denial of a hearing is properly remedied through mandamus" when police officer was terminated without a hearing as required by the Police and Fire Commissioners Act); *Chriswell v. Rosewell*, 388 N.E.2d 175, 177 (Ill. App. Ct. 1979) (mandamus was proper because the chief probation officer, who indefinitely suspended the probation

officer, was only statutorily authorized to issue suspensions for thirty days or less and only if notice of charges and hearing were provided).

Ores argues that mandamus was unavailable because he "is challenging … [Jones's] decision to discipline him at all, which is a discretionary decision." Pl.'s Br. and Resp. at 15. But as the cases cited above demonstrate, a police chief's decision to suspend an officer for more than five days is *not* discretionary because the chief does not have the authority to initiate that suspension in the first place. To be sure, if Jones had suspended Ores for five days or less, then Ores could not have used mandamus to challenge Jones's discretion to suspend. *See Rochon,* 689 N.E.2d at 291 ("the trial court could not use *mandamus* to direct the superintendent to exercise his discretion" not to terminate officers for missing class). But if that had happened, then Ores would have a process available to him—the Act specifically provides, as discussed earlier, an appeal to the Board in that circumstance. In any event, mandamus was available to challenge what actually did happen here, so Ores's due-process claim fails.

### 6. Declaratory Judgment and Injunction

Lastly, declaratory judgment and injunction actions were also available to Ores. Defs.' Br. at 11-12. Like mandamus, both of these state-court actions can be used to challenge "the period of suspension where the suspending officer is without authority" or "exerts [power] in a manner in contravention of statute." *Fruhling v. Champaign Cty.*, 420 N.E.2d 1066, 1069 (Ill. App. Ct. 1981). In *Fruhling*, a deputy sheriff brought a declaratory judgment action for backpay and reinstatement when

his suspension and termination by the sheriff were "without legal authority and therefore void." *Id.* Although the municipality's rules required the sheriff to file charges with the Merit Commission for any suspension over thirty days, "[i]t [was] unquestioned that the sheriff followed none of the above regulations when he unilaterally suspended and subsequently terminated plaintiff's employment. The sheriff's failure to comply with procedural rules of the Merit Commission [was] a jurisdictional question which renders his actions void." *Id.* at 1070. A declaratory judgment action, therefore, was a proper vehicle to challenge the sheriff's unlawful and unilateral action. *Id.* The same is true of an action for injunctive relief, which will "be granted against public officials [if] such acts are outside their authority or are unlawful." *Sherman v. Bd. of Fire & Police Comm'rs of City of Highland*, 445 N.E.2d 1, 6 (Ill. App. Ct. 1982) (citation omitted) (police officers properly sought to enjoin the Board of Fire and Police Commissioners from holding a hearing on their pending charges when the Board failed to set a hearing within thirty days, as required by the Illinois Fire and Police Commissioners Act). Like *Fruhling* and *Sherman*, Ores is also asserting that Jones acted without legal authority and in contravention of statute in issuing the fifteen-day suspension.

Citing *Sherman*, Ores argues that an injunction was unavailable because it can only be used to challenge the decision of an administrative agency, and not a single decisonmaker like Jones. Pl.'s Br. and Resp. at 16. But this is too broad a reading of *Sherman*, which states that injunctions are available "against public officials." 445 N.E.2d at 6. And countless Illinois state-court actions are brought for

injunctive relief against all manner of defendants, including individuals, corporations, and other entities that are not administrative agencies. So, in addition to mandamus, Ores had two other state-court vehicles by which to challenge the fifteen-day suspension. The availability of state-law relief means that Ores did not suffer a procedural due process violation.

## C. Qualified Immunity

For the sake of completeness, the Court will also address qualified immunity even though it has already held that Chief Jones committed no constitutional violation because state-law mandamus, declaratory, and injunctive relief were available to Ores.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield public officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Put another way, the general purpose of qualified immunity is to allow government officials to "reasonably … anticipate when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (citation and quotations omitted). In the two-part qualified immunity analysis, a plaintiff must show that (1) the defendant

violated her constitutional rights; and (2) "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008) (citations and quotations omitted).

For the sake of discussion, assume that no state-law remedies were available to Ores. In that scenario, there would have been a constitutional violation when Jones unilaterally suspended Ores for fifteen days without providing any sort of post-deprivation process "unless the officer *consented to the proposed suspension.*" Mot. to Dismiss Opinion at 10-11 (emphasis added); *see supra* Section III(A)(2). Thus, the qualified immunity question would have been the following: would a reasonable police chief in Jones's position have known that he had the authority—that is, the officer's consent—to enter into a negotiated discipline waiving post-deprivation due process? The answer to this question is no, because the undisputed record shows that a reasonable officer in Jones's circumstances should have known that Ores did not consent to the deal negotiated by Kuzas.

The Court first notes that Jones admitted that he lacked the authority to suspend Ores for fifteen days, without any referral to the Board, unless Ores agreed to the discipline: "I knew that as the Chief of Police, I could not impose more than a 5-day suspension pursuant to Illinois statute, unless the officer, after union representation, consented to the resolution proposed." Jones Aff. at 4. So consent would be crucial. The record evidence establishes that a reasonable officer in Jones's position should have discovered that Ores was in the dark about the agreement as

soon as Jones notified Ores of the discipline on February 21, 2012. It is true that a reasonable jury could find that Jones *initially* believed—during his negotiations with Kuzas—that Kuzas had the authority to make this agreement on behalf of Ores and thus that Jones could impose the suspension based on the deal. The union had appointed Kuzas to represent Ores, and Kuzas went to the interrogation with Ores. Kuzas Dep. 9:18-24. After the interrogation, Kuzas spoke with Jones several times about Ores's case and expressed Kuzas's concerns, apparently on Ores's behalf, about imposing too harsh a punishment. Kuzas Dep. 13:6-17:22. So it was reasonable for Jones to believe that Kuzas was representing Ores's views during these discussions. Jones also believed that there was a provision in the collective bargaining agreement allowing him to suspend for over five days in the case of a mutual agreement. *Id.* 61:7-14. And in the past, Jones had made similar agreements with two other officers who had had agreed to suspensions of over five days. *Id.* 78:19-79:15 (citing Jones Aff. at 4). All these factors led Jones to reasonably believe that Ores had consented to the fifteen-day suspension—at first.

Nevertheless, an officer in Jones's position should have realized that Ores had not consented to the agreement (and in fact, had not even known about it) as soon as Jones gave Ores the formal disciplinary report on February 21, 2012, and no reasonable jury could find otherwise. Although Jones testified in his deposition that he did not remember Ores's response to the issuance of the suspension, Jones did write in his affidavit that "Ores expressed that he believed my decision to impose a 15-day suspension was too harsh." Defs.' Resp. PSOF ¶ 25; Jones Dep. 63:16-21

(citing Jones Aff. at 3).[6] For his part, Ores testified that when Jones handed him the formal suspension, he "looked at Jones" and said: "really? A 15-day suspension? … and I said this is—this is severe, I believe was the word I used." Ores Dep. 39:2-22. Defendants do not dispute Ores's response or offer any evidence to controvert Ores's surprise at learning about his suspension. Defs.' Resp. PSOF ¶ 25. Ores's response should have alerted Jones that Ores had not actually agreed to the suspension. Plus, at this point, a reasonable officer in Jones's position would have recognized other facts demonstrating Ores's lack of consent—for one, Jones never obtained a written signoff from Ores acknowledging that he accepted and understood the fifteen-day suspension. Jones Dep. 78:19-79:7 (citing Jones Aff. at 4). Nor had Jones ever asked Ores whether he would agree to a fifteen-day suspension. *Id.* 61:19-21. Finally, Defendants even admit that the first time Ores found out about the fifteen-day suspension was on February 20, 2012—the day before he received it—when he saw it sitting on Spigolon's desk and heard rumors from other officers. Defs.' Resp. PSOF ¶ 27; Ores Dep. 39:2-22. And Ores told Jones (again, based on Ores's undisputed testimony) that finding out about his suspension in this manner was

---

[6]Jones's lack of memory at his deposition on this point—Ores's response to receiving his formal disciplinary report—does not create a factual dispute. First, the defense of course adopts Jones's affidavit. Defs.' Resp. PSOF ¶ 25. Furthermore, in circumstances like this one, "[a] statement of 'I don't recall,' suggests a 'mere possibility' of a dispute, which [does] not satisfy the requirements of Rule 56." *Hammel v. Eau Galle Cheese Factory*, 2003 WL 21067091, at *12 (W.D. Wis. Apr. 15, 2003) (citing *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983)). It is true that there are circumstances where a witness's lack of memory could create a genuine issue of fact, because the circumstances dictate interpreting (or at least allowing a reasonable jury to interpret) the "I don't recall" statement as the equivalent of "It did not happen because I would have remembered that." But here, given all of the other evidence of Ores's surprise about the suspension, Jones's failure to remember is not affirmative evidence that Ores did not respond in this way.

"unprofessional." *Id.* If Ores had consented to the agreement between Kuzas and Jones, then he would have known about his suspension long before he saw it on Spigolon's desk. There is no dispute in the record, then, that Ores did not know about the agreement, and that by February 21, 2012, Jones should have been aware of Ores's lack of consent.[7]

Consequently, while it was reasonable for Jones to *initially* believe that he had the authority to negotiate an agreement about Ores with Kuzas, the record shows that this belief became unreasonable as soon as Jones issued the formal suspension to Ores in February 2012, when Ores expressed surprise.[8] As a result, had the Court held that there was a constitutional violation, qualified immunity would not have protected Jones because a reasonable officer in his position should have known that Ores's lack of consent deprived Jones of the authority to suspend Ores for fifteen days.[9]

---

[7]Although Ores also seems to challenge that Jones and Kuzas actually arrived at an agreement between the two of them, Pl.'s Br. and Resp. at 12-13, there is no genuine dispute as to this issue. Both Jones and Kuzas testified that they engaged in negotiations and came up with an agreement. Jones Dep. 58:13-64:22; Kuzas Dep. 13:15-23:15. Ores's evidence, such as his surprise when he received the formal disciplinary report, goes to *Ores's* knowledge of and consent to the agreement, and not to its actual existence as between Jones and Kuzas. Pl.'s Br. and Resp. at 13.

[8]For the same reasons, the Court rejects Defendants' arguments as to liability (in addition to qualified immunity) that Ores waived his right to post-suspension procedures through the agreement between Kuzas and Jones. Defs.' Br. at 8-9. But this determination does not affect the Court's holding that there was no constitutional violation because other state-court remedies were available. *See supra* Section III(B).

[9]Defendants also argue that Kuzas had apparent authority to negotiate the agreement on Ores's behalf. Defs.' Br. at 8-9. But this argument also fails. "Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *N. Trust Co. v. St. Francis Hosp.*, 522 N.E.2d 699, 704 (Ill. App. Ct. 1988). As the Court previously explained, Ores's response to the suspension in February 2012 should have alerted Jones that Ores did not give Kuzas the authority to negotiate on his behalf.

## D. *Monell* Liability

Even though the Court has already decided that Chief Jones did not commit a procedural due process violation, and even though that liability would be a necessary premise for *Monell* liability against the Village of Dolton, the Court will address (again, for the sake of completeness) the parties' remaining arguments on Dolton's liability. The Court grants Dolton's motion for summary judgment on municipal liability for the separate reason that Chief Jones was not a final policymaker, for *Monell* purposes, for the imposed suspension.

Section 1983 provides, in relevant part, that "[e]very *person* who … subjects … any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured … ." 42 U.S.C. § 1983 (emphasis added). In *Monell*, the Supreme Court held that local governmental entities are "persons" under Section 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 689 (1978). To establish municipal liability—that is, a government policy or custom that violates a plaintiff's rights—a plaintiff can show "an express policy causing the loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999) (citation omitted). Only the third option is at issue in this case, and the parties dispute whether Jones is a person with final policymaking authority. Defs.' Br. at 14; Pl.'s Br. and Resp. at 16-17.

A final policymaker has "authority to adopt rules for the conduct of government." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). This official "has final authority in the sense that there is no higher authority" and cannot be a person whose "actions are constrained by rules and policies of a higher power." *Kasak v. Vill. of Bedford Park*, 563 F. Supp. 2d 864, 881 (N.D. Ill. 2008) (citations omitted). Federal courts evaluate state and local law in order to evaluate who counts as a final policymaker. *Kujawski*, 183 F.3d at 737. In this case, Chief Jones was not a final policymaker because his actions were constrained by the Board, as explained earlier in the Opinion. *See supra* Section III(B)(1). Because the Village of Dolton has adopted the Illinois Fire and Police Commission Act, "the Board of Police Commissioners has final policymaking authority with regard to police department employment decisions." *Graham v. Vill. of Dolton*, 2011 WL 43026, *7 (N.D. Ill. Jan. 6, 2011) (citing 65 ILCS 5/10-2.1-1); *see also Kasak*, 563 F. Supp. 2d 882 ("Village ordinances make clear that the final authority with respect to an employee's disciplinary action rests with the Village Board, not the police chief."). And "[w]hile the Chief may act on his own to suspend an officer, he is limited to imposing suspensions of five days or less, and an officer may appeal his suspension to the Board." *Nitschneider*, 821 F. Supp. at 1261. Thus, Chief Jones "is not the final policymaker regarding employee discipline and discharge, nor does he shape the employment policy for the Department." *Id.*[10] This is a separate and independent ground for concluding that there is no municipal liability against Dolton.

_____

[10]As a final note, Ores also moves to strike multiple portions of Defendants' statement of facts, Defendants' response to Ores's statement of facts, and Defendants'

# IV. Conclusion

For the reasons discussed above, Defendants' motion for summary judgment, R. 56, is granted, and Ores's cross motion for summary judgment, R. 66, is denied.

ENTERED:

<u>      s/Edmond E. Chang      </u>
Honorable Edmond E. Chang
United States District Judge

DATE: December 23, 2015

---

summary judgment brief. *See, e.g.*, Pl.'s Resp. DSOF; Pl.'s Br. and Resp. at 5-6; Pl.'s Reply at 2-4. This motion is denied because Defendants substantially complied with the local rules, citing to the record in their Rule 56.1 statements and to the Rule 56.1 statements in their briefs. Furthermore, Defendants did not impermissibly add additional facts to their responses to Ores's Rule 56.1 statements but rather cited facts substantiating their disagreement with Ores's version of the events.